



FILED

JUL -3 2008

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| RAFAEL MADRIGAL, JR., | Case No. CV 07-7251-GAF (MLG) |
| Petitioner, | ORDER ON PETITIONER'S REQUEST FOR AUTHORIZATION TO CONDUCT DISCOVERY AND MOTION FOR AN EVIDENTIARY HEARING |
| v. | |
| JAMES YATES, Warden | |
| Respondent. | |

On November 1, 2007, Petitioner Rafael Madrigal, Jr. filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court appointed counsel to represent Petitioner on February 25, 2008. On May 1, 2008, Petitioner filed a request for authorization to conduct discovery and a motion for an evidentiary hearing. Respondent submitted oppositions to the motions on June 2, 2008. Petitioner filed replies on June 16, 2008. For the reasons stated below, Petitioner's request for authorization to conduct discovery is **GRANTED** as to a subpoena duces tecum for police investigatory reports relating to the killings of Steve Romero and Marcos Torres and **DENIED** as to all other requested discovery. The motion for an

evidentiary hearing is **GRANTED** in part and **DENIED** in part. A telephonic status conference will be held on July 17, 2008 at 10:00 a.m., at which time the evidentiary hearing will be scheduled, procedures for the evidentiary hearing will be set, and the parties will identify those witnesses whom they expect to call to testify at the evidentiary hearing.

## I.    Factual and Procedural Background

On January 5, 2001, Petitioner was convicted of the attempted murder of Ricardo Aguilera, Cal. Pen. Code ("CPC") § 664/187(a), with an enhancement for personal use of a handgun, CPC § 12022.53, and a gang enhancement, CPC § 186.22(b)(1). (Clerk's Transcript ("CT") 54-55.) He was sentenced to 25 years to life without parole plus 28 years. (CT 134.) Petitioner raises four grounds for relief in this petition: (1) ineffective assistance of trial counsel ("IAC") for multiple failures to investigate and present evidence of the third party culpability of Manuel Mendoza; (2) IAC for failure to investigate and present corroborating evidence regarding Petitioner's alibi that he was at work at the time of Aguilera's shooting; (3) IAC for failure to investigate and present other exculpatory evidence to corroborate Petitioner's innocence; and (4) a *Brady*[1] claim for the prosecution's failure to disclose exculpatory evidence.

### A.    Aguilera's Shooting

During the summer of 2000, members of the rival Marianna Maravilla ("Marianna") and Ford Maravilla ("Ford") gangs of East Los Angeles appear to have engaged in a series of retaliatory attacks,

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

1  leading to Aguilera's shooting. The attacks began on May 27, 2000,

2  when Marianna gang member Steve Romero was shot and killed.

3  (Reporter's Transcript ("RT") 991.) Marianna retaliated by shooting

4  and killing Ford gang member Marcos Torres on June 29. (RT at 991-

5  92.) Aguilera's shooting followed six days later.

6      On the afternoon of July 5, 2000, Aguilera was visiting Michael

7  and Carlos Moreno in East Los Angeles. Michael had previously been

8  a Marianna gang member. Around 3:00 or 3:15 p.m., Michael and

9  Aguilera were outside when a truck and a car slowed in front of the

10  Morenos' apartment. Michael and Aguilera ran inside and Michael told

11  his mother that Ford gang members were outside planning to do

12  something. Michael indicated that "Go-Go," later identified as

13  Petitioner's co-defendant Francisco Olivares, was one of the

14  individuals in the truck.

15      Michael, Carlos and Aguilera went outside to bring in the

16  family's other children. While they were outside, the truck stopped

17  at the apartment's driveway and the passenger repeatedly asked

18  Aguilera, "Where are you from[?]" Aguilera understood that the

19  passenger was asking for his gang affiliation and replied three times

20  that he was from "nowhere." Aguilera turned and ran towards the

21  apartment. (RT 257.) The passenger then fired several shots from the

22  car, one of which hit Aguilera in the back of the head. (RT 257.)

23  Aguilera survived the shooting.

24      Aguilera could not identify the shooter, but told a sheriff's

25  detective that he had previously seen the shooter at Baby's Liquors,

26  a Ford gang hangout on Olympic Boulevard. (RT 624.) On July 11, 2000,

27  Carlos Moreno identified a photograph of Petitioner from the

28  sheriff's department gang book as being the passenger and putative

shooter.[2] On July 20, 2000, Petitioner was arrested. (RT 556.) At the time of his arrest, Petitioner was married with two children, had been working steadily since 1994, owned a home, and had a single misdemeanor conviction on his record for possession of an item worth less than $400 with the serial number removed, California Penal Code ("CPC") § 537(e)(1).

**B.   Petitioner's Trial**

On January 5, 2001, the state filed a one count information charging Petitioner with the attempted murder of Aguilera, with personal use of a handgun and gang enhancements. (CT 54-55.) The state filed an amended information adding Olivares as a co-defendant on the same charges, and charging Olivares with assault with a deadly weapon. CPC § 245(a)(2). (CT 60-A-C.) The trial of Petitioner and Olivares began on January 4, 2002.

**1.   The Prosecution's Evidence against Petitioner**

Three eyewitnesses linked Petitioner to the shooting. As stated above, Carlos Moreno photographically identified Petitioner as the passenger on July 11, 2000.[3] (RT 394-96.) Carlos also identified Petitioner in court as the passenger. (RT 393.) However, Carlos had failed to identify Petitioner as the passenger during a corporeal lineup in July 2001. (RT 404.) Carlos testified that he had been reluctant to participate in the lineup due to concern for his

---

[2] At trial, Carlos testified that he never actually saw the passenger holding a gun. (RT 436.)

[3] The photo used to identify Petitioner apparently depicted him at about 16 years of age (RT 748), where he was 25 years old at the time of the crime.

4

family's safety.[4] (RT 397.) Though Carlos' fear for his family's safety as a result of his participation in the investigation might have been "in the back of [his] mind" at the lineup, the reason Carlos didn't identify Petitioner at the lineup was that he "really didn't recognize him." (RT 404.) Carlos "did [his] best and couldn't pick anybody out that day." (RT 452.)

Carlos testified that when the shooting occurred, he was standing about eighteen feet in front of the truck. (RT 432.) He initially testified that he saw the passenger for "a good five minutes," but later testified that he saw the passenger for only a few seconds. (RT 432-33.) Carlos described the passenger as a "little gang banger" in his early twenties - certainly no older than twenty-five years of age - who had a mustache and dark goatee,[5] wore a white baseball cap with an orange brim, and appeared to have a cleanly-shaved head. (RT 419, 421-22.) Carlos testified that he did not see a gun at the time of the shooting and thus never saw the passenger holding or firing a gun. (RT 418, 436.)

Jessica and Salvador Huezo, teenage neighbors of the Morenos, also testified about the identity of the perpetrators. Jessica was across the street from the Morenos' apartment when the shooting occurred and saw only the truck's driver. (RT 299.) At a live lineup in July 2001, Jessica identified either Petitioner or another

---

[4] The basis for Carlos' concern was that a police report was circulating on the "streets" with his name and the names of other witnesses, that someone shot his brother Michael (the bullet apparently grazed Michael's face, causing no serious injury), that his mom was followed to work, that his mom's car was egged, and that a car full of overweight women seemed to be following him. (RT 398, 401-02.)

[5] According to a police field identification card, Petitioner had a mustache but not a goatee on May 27, 2000. (RT 578.)

1  individual in the lineup as the driver. (RT 306.) In court she did
2  not identify Petitioner as one of the perpetrators. (RT 300.)

3      Salvador, Jessica's younger brother, was about twenty or twenty-
4  five feet to the rear and on the passenger side of the truck when he
5  saw the passenger lean out with a gun. (RT 342.) He ducked and then
6  ran away when he saw the gun, so he didn't see the passenger shoot
7  the gun. (RT 342.) Salvador testified that he saw the passenger's
8  face and identified Petitioner in court as the passenger. (RT 345.)
9  Salvador then testified that he had identified Petitioner in a photo
10 "six pack," but in fact he had never participated in a photographic
11 lineup which included Petitioner's photo. (RT 346-47, 587-88.)
12 Salvador also testified that the passenger had a mustache and
13 "goatee," though according to Salvador's description of the
14 passenger's goatee, it was not a goatee at all but what would
15 ordinarily be called a "Fu Manchu" mustache. (RT 358-59.) Salvador
16 further described the passenger as having a shaved head, but did not
17 recall the passenger or anyone else wearing a white baseball cap with
18 an orange brim. (RT 359.) Finally, Salvador testified that when he
19 walked into the courtroom that day, he expected the shooter to be
20 there. (RT 364.)

21     Sheriff's Detective Michael Delmuro, an expert on East Los
22 Angeles gangs who investigated Aguilera's shooting, testified that
23 as of July 5, 2000, Petitioner was a Ford gang member nicknamed
24 "Mugsy." (RT 551-52.) Delmuro's belief in Petitioner's continued gang
25 membership as of that date was informed by a variety of information.[6]

26  _____

27     [6] This included a list of Ford gang members dating from before 1999
    that was seized from Petitioner's house in March 2000; Delmuro's
28  mistaken identification of another Ford member with gang tattoos as
    Petitioner; a state-generated gang booklet identifying hundreds of Ford

1  Delmuro's testimony that Petitioner was a Ford gang member and
2  the eyewitness testimony provided by Carlos and the Huezos
3  constituted the only incriminating evidence presented against
4  Petitioner. There was no physical evidence, including ballistics,
5  linking Petitioner to the crime. (RT 586-87, 605.)

6                    **2.   Petitioner's Alibi Defense**

7  Petitioner's counsel, Andy Stein, laid out the contours of an
8  alibi defense in his opening statement.[7] Stein stated that the
9  evidence would show that Petitioner was at work in Rancho Cucamonga
10 until 3:30 p.m. on the day of the shooting. (RT 197-99.) Stein also
11 stated that Petitioner would testify that a fellow gang member
12 actually shot Aguilera. (RT 200.) Stein finally stated that the
13 state's own gang expert would testify that a gang member who
14 testifies against another member of his gang is signing his own death
15 warrant. (RT 200.)

16 Stein called Steven Finley as a witness. Finley was Petitioner's
17 supervisor at Proaction Packaging and Display, a company located in
18 Rancho Cucamonga, Riverside County. Finley testified that Petitioner
19 ran a lamination machine and that if Petitioner had left before 3:00
20 p.m. on July 5, 2000, production would have stopped. (RT 689, 707.)
21 However, production documents from July 5, 2000 showed ongoing
22

23 _____

members, in which the entry for Petitioner is the only handwritten
24 entry; the California computer gang system; a July 24, 2000 interview
with Petitioner in which he admitted that he continued to spend time
25 with Ford gang members; and a series of field interview cards
identifying Petitioner as a Ford gang member. (RT 563, 576-78, 583,
26 610-11, 613.)

27 [7] The presiding judge instructed the jury that, "[T]he purpose of
an opening statement is for the attorneys to tell [you what] they
expect the evidence to show. ... If something said by the attorneys
28 doesn't turn out in the evidence, then disregard it." (RT 187.)

1  production on Petitioner's machine only until 1:40 p.m., after which
2  time Petitioner's absence would not have stopped production. (RT 730,
3  732.) Finley also testified that Petitioner and his brother, Victor
4  Madrigal, carpooled to work every day, clocked in and clocked out at
5  the same time, and that Victor clocked out at 3:30 p.m. on July 5,
6  2000. (RT 711, 722, 728.) However, Finley did not remember whether
7  Petitioner and his brother left together on July 5, 2000. (RT 734.)
8  Finley further testified that he signed a time card indicating
9  Petitioner had been at work on July 5, 2000 until 3:32 p.m., but that
10 he had probably done so in response to Victor Madrigal's concern that
11 Petitioner had not clocked out that day.[8] (RT 705, 723.) Finley
12 conceded that an employee could leave 30 minutes to an hour early
13 without him noticing. (RT 728.) While Finley had told investigators
14 in September and December 2000 that he was sure Petitioner worked his
15 entire shift on July 5, 2000, Finley admitted that he could not be
16 absolutely certain that Petitioner had in fact worked his entire
17 shift that day. (RT 735, 739.)

18     Petitioner's cousin, Richard Pimienta, testified that Petitieonr
19 did not have a goatee when he attended Richard's wedding on July 1,
20 2000. (RT 742.) Richard authenticated several pictures of Petitioner
21 taken at the wedding, which Richard described as depicting Petitioner
22 without a goatee. (RT 742-43.)

23     Petitioner's wife, Veronica Madrigal, testified that Petitioner
24 no longer associated with Ford gang members. (RT 756.) She did note
25 that in 2000 Petitioner had been at a birthday party where Ford gang
26 members were present. (RT 756.)

27 _____

28     [8] Finley had regularly handwritten in times on Petitioner's time
cards that year. (RT 695-704.)

1    Petitioner's defense rested with the conclusion of Veronica's
2    testimony. (RT 759.) Stein never put Petitioner on the stand to
3    identify the fellow Ford member who Petitioner believed actually shot
4    Aguilera, even though his opening statement informed the jury that
5    he would do so. In fact, Stein did not present evidence of third
6    party culpability at all. Stein came closest to doing so when he
7    cross-examined Detective Delmuro regarding Ford gang member Manuel
8    Mendoza. (RT 585.) Delmuro testified that in a gang booklet
9    photograph, Mendoza had a light goatee. (RT 585.) Delmuro also
10   testified that Mendoza was in custody for an unrelated shooting, but
11   that the sheriff's department had not compared the bullets fired in
12   that incident to the bullets fired at Aguilera. (RT 585.)

13   On January 18, 2002, after four days of deliberations, the jury
14   found Petitioner and Olivares guilty of all charges. (RT 920-23.) The
15   trial court granted Stein's motion to continue the case for
16   preparation of a motion for a new trial. (CT 110.)

17   **C.   The Motion for New Trial**

18   After several continuances, Stein filed a motion on September
19   6, 2002 to test ballistic evidence from Aguilera's shooting against
20   a .38 caliber revolver seized from Manuel Mendoza on June 8, 2001.
21   (Supplement to Clerk's Transcript ("SCT") 38, 48, RT 1001.)
22   Ballistics tests showed that the loaded .38 caliber revolver found
23   in Mendoza's possession was the weapon used in Aguilera's shooting.
24   (SCT 26, 64-65.) Furthermore, tests of a residue found on Mendoza's
25   hand on June 8, 2001 were consistent with handling or discharging a
26   firearm. (SCT 27, 62.) On May 9, 2003, Counsel noticed a motion for
27   a new trial to present the results of these tests as evidence of
28   Mendoza's culpability for Aguilera's shooting. (SCT 24.)

1  The court held a series of hearings on the motion for a new

2  trial in September 2003. Counsel began these hearings by calling

3  Mendoza as a witness. After spelling his name and disclosing his date

4  of birth, Mendoza asserted his Fifth Amendment right to remain silent

5  on every question subsequently asked by Counsel. (RT 935-950.)

6  Counsel then examined Petitioner. Petitioner testified that in

7  May 2000 he saw Mendoza and other Ford gang members at his sister

8  Lorena Parra's house in East Los Angeles, where he often visited on

9  the weekends.[9] (RT 954-55, 957.) Petitioner testified that Mendoza

10  had a gun and left with some of the gang members. (RT 955.) When

11  Mendoza and the others returned after 20 minutes, Mendoza reportedly

12  told Petitioner to get off the street because he had just "lit up a

13  dude [Steve "Pollo" Romero] from Marianna at Baby's." (RT 956.)

14  Petitioner testified that he was again at his sister's house in

15  June 2000 when he saw Mendoza and a gang member Petitioner knew only

16  as "Bam-Bam." Mendoza and Bam-Bam reportedly told Petitioner and

17  several other Ford gang members to leave because "they had just

18  blasted at Largo," a.k.a. "Froggy," a former Ford gang member who had

19  become a Marianna gang member. (RT 957-58.)

20  Petitioner testified that he was also at his sister's house on

21  the day that Marcos "Fat Boy" Torres, a Ford gang member, was killed.

22  (RT 958-59.) Mendoza and several other Ford gang members who

23  Petitioner saw there reportedly discussed Torres' killing as

24  retaliation for Romero's killing. (RT 960.)

25  Petitioner then testified about his time in jail with Mendoza

26  – who was incarcerated for an unrelated offense – and Olivares. (RT

27  ───────────────

28  [9] Petitioner later clarified that the gang members were not at his sister's house, but congregated around a neighboring house.

10

964.) Petitioner testified that sometime between July and December 2000, he witnessed a conversation between Mendoza and Olivares about a gun Mendoza had hidden that Petitioner later believed to be the gun used in Aguilera's shooting. (RT 964.) Petitioner further testified that in the summer or fall of 2001, he witnessed Mendoza – who after being released was arrested again on June 8, 2001 for possession of the .38 caliber revolver – and Olivares arguing about that gun. (RT 967.) Olivares reportedly scolded Mendoza for getting arrested with the .38 caliber revolver after he told Mendoza to get rid of it. (RT 967.) Petitioner also testified that Mendoza later told Olivares that if he had known that Olivares was "going to act this way [about the gun] [Mendoza] would have never have done nothing with him." (RT 968.) Petitioner interpreted this as an admission by Mendoza that he shot Aguilera. (RT 968, 985.)

Petitioner testified that prior to trial he had informed Stein that Mendoza was Aguilera's shooter, but had not informed Counsel why he believed this. (RT 968.) Petitioner testified that he had failed to so inform counsel because (1) Olivares threatened that Petitioner would be stabbed if he did so and (2) because Petitioner was at work at the time of the shooting, was therefore demonstrably innocent, and had no reason to implicate anybody else for the crime. (RT 969, 989.) Petitioner testified that he finally informed Stein of the jailhouse conversations and arguments between Mendoza and Olivares in March 2003.[10] (RT 982, 985.)

---

[10] This is certainly wrong, because Stein informed the trial court of his awareness of the jailhouse conversation and argument at trial: "My client, if he testifies, is going to testify [that Olivares] and Mr. Mendoza, who is presently in custody for an unrelated shooting, confessed the crime to each other in front of him while he was in the county jail." (RT 592.)

1    Stein lastly examined Detective Delmuro. Delmuro confirmed that
2    Petitioner had put his life and the well-being of his family in
3    jeopardy by implicating Mendoza. (RT 994-95.) Delmuro testified that
4    in 2000, Mendoza was an active Ford gang member. (RT 992.) Police
5    reports and testimony by Delmuro showed that Mendoza was the prime
6    suspect in the March 11, 2001 walk-up shooting of a Fraser Maravilla
7    gang member with a .380 caliber semi-automatic handgun (to be
8    distinguished from the .38 caliber revolver used in the Aguilera
9    shooting). (RT 995, 1004; SCT 84-89.) Delmuro testified that it was
10   common for a single weapon – such as the .38 caliber revolver – to
11   pass among members of the same gang. (RT 1001.)

12       Delmuro's testimony also concerned his failure to disclose
13   information about Mendoza to the district attorney in Petitioner's
14   case ("the Prosecutor"). Delmuro testified that he had never informed
15   the Prosecutor that Mendoza was a suspect in a nearby gang shooting,
16   even after the Prosecutor told Delmuro that Stein believed Mendoza
17   to be Aguilera's actual shooter. (RT 993, 1002-1003.) Delmuro also
18   testified that he had not believed the .38 caliber revolver found in
19   Mendoza's possession on June 8, 2001 was used in the shooting of
20   Aguilera because Petitioner had already been arrested for that crime.
21   (RT 1000-1001.)

22       The trial court denied Petitioner's motion for a new trial on
23   September 26, 2003. (RT 1018.) The court sentenced Petitioner to life
24   with the possibility of parole plus 28 years to life. (CT 131, 134-
25   35.)

26       **D.   Exhibits Filed with the Supreme Court of California**
27       After Petitioner was denied relief on direct review, 2005 Cal.
28   App. Unpub. LEXIS 9385 at *27; Case No. S139604, the California Court

of Appeal denied his petition for writ of habeas corpus, Case No. B183302. Petitioner then filed a petition for writ of habeas corpus to the Supreme Court of California supported by 23 exhibits.[11] (Lodged Doc. No. 15). Among the exhibits submitted was the transcript of a surreptitiously taped jailhouse conversation between Olivares and his girlfriend from August 17, 2001. (Lodged Doc. No. 15, Ex. I.) Stein had been given a copy of the tape of this conversation on November 5, 2001, prior to trial. (CT 76.) In the conversation, Olivares told his girlfriend that Petitioner had enlisted his brother to "find out who really did it," i.e., who really shot Aguilera. (*Id.*) This angered Olivares, who believed this to be "none of [Petitioner's] business." (*Id.*) Olivares also said that Petitioner "looks at me or he looks at Dreamer [Mendoza's gang moniker] you know what I'm saying? So he either already knows but... he don't know shit you know, he don't know what happened..." (*Id.*) The conversation contained other information suggesting Petitioner's innocence.

The exhibits also included a letter from Stein to Petitioner's current counsel, who represented him in his habeas petition before the Supreme Court of California. (Lodged Doc. No. 15, Ex. W.) In the letter, Stein attempts to explain some of the choices he made at trial.

## II.   Petitioner Did Not "Fail to Develop" the Record before the State Courts

To be entitled to either discovery or an evidentiary hearing, Petitioner must make the threshold showing that he did not "fail[]

---

[11] The Supreme Court denied the petition without comment. Case No. S147701.

to develop the factual basis of a claim in State court proceedings."[12]
28 U.S.C. § 2254(e)(2); *see Holland v. Jackson*, 542 U.S. 649, 652-53
(2004)(per curiam)(holding that "failed to develop" requirement of
section 2254(e)(2) is applicable to the admission of any new evidence
in a federal habeas proceeding, not only new evidence adduced at an
evidentiary hearing). "[A] failure to develop the factual basis of
a claim is not established unless there is a lack of diligence, or
some greater fault, attributable to the prisoner or the prisoner's
counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Petitioner
exercised such diligence. In his petition for writ of habeas corpus
to the Supreme Court of California, which was denied without comment,
Petitioner requested that the court "issue an order to show cause"
and "designate a referee to make factual findings." (Pet. to Sup. Ct.
of Cal. at 82, Lodged Doc. No. 15.) These requests demonstrate
diligence in attempting to develop the record. *See Williams*, 529 U.S.
at 437 ("Diligence will require in the usual case that the prisoner,
at a minimum, seek an evidentiary hearing in state court in the
manner prescribed by state law."). Petitioner also assembled and
submitted to the supreme court 23 exhibits to supplement the factual
basis for his claims.

In short, Petitioner diligently pursued the factual development
of his claims before the state courts. He has not "failed to develop"
the record. While this alone does not entitle him to discovery or an
evidentiary hearing, it means that he has passed the section

---

[12] If a petitioner has "failed to develop" the record, he or she
may otherwise meet the requirements of section 2254(e)(2) by making two
distinct showings. *See* 28 U.S.C. § 2254(e)(2)(A) & (B). Because
Petitioner cannot make either of these showings, he must demonstrate
that he did not fail to develop the record.

14

1   2254(e)(2) threshold.

2

3   **III. Petitioner is Not Entitled to Discovery, Except as to**
4   **Investigatory Reports of the Killings in May and June 2000**

5   A habeas corpus petitioner does not have a free-standing right
6   to pursue discovery in the manner of other civil litigants. *See*
7   *Harris v. Nelson*, 394 U.S. 286, 290 (1969). However, a habeas corpus
8   petitioner may employ discovery mechanisms from the Federal Rules of
9   Civil Procedure on a showing of "good cause." Rules Governing Section
10  2254 Cases, Rule 6. "Good cause" is established by "specific
11  allegations" demonstrating entitlement to relief if the facts are
12  fully developed. *Bracy v. Gramley*, 520 U.S. 899, 908-09
13  (1997)(*quoting Harris*, 394 U.S. at 300). "It is [then] the duty of
14  the court to provide the necessary facilities and procedures for an
15  adequate inquiry." *Harris*, 394 U.S. at 300. Under this standard,
16  Petitioner is not entitled to any of the discovery that he seeks to
17  conduct, except a subpoena duces tecum for investigatory reports of
18  the murders of Romero and Torres in May and June 2000.

19      **A.    Petitioner is Not Entitled to Subpoenas Duces Tecum for**
20          **Documents Establishing Manuel Mendoza's Record of Violent**
21          **Gang Activity**

22      Petitioner seeks subpoenas duces tecum for several types of
23  documents relating to Mendoza's record of violent gang activity:
24  Mendoza's rap sheet, including all arrests, convictions, and
25  dispositions; all police reports relating to the March 11, 2001
26  attempted murder of Jose Vera by Mendoza; police reports regarding
27  a 1998 attempted murder; police reports relating to the alleged 1996
28  murder of Justin Hartt by Mendoza; and the Los Angeles Sheriff's

1  Department gang member file for Mendoza. Petitioner contends that

2  these documents are necessary to resolve his claim that Stein

3  provided constitutionally ineffective assistance of counsel by

4  failing to present a defense that Mendoza was the actual shooter.

5  Petitioner also seems to suggest that these documents are necessary

6  to resolve his *Brady* claim.

7      To determine whether there is "good cause" for discovery of

8  these documents, the Court must consider what they could be used to

9  show in the instant action. As an initial matter, they could *not* be

10  used to show that Stein's failure to obtain such documents, or the

11  government's failure to produce them for the defense, led to the

12  absence of evidence which otherwise would have demonstrated that

13  Mendoza shot Aguilera. This is because documentation of Mendoza's

14  history of violent gang crime would have been inadmissible at trial.

15      Third-party culpability evidence is admissible in California

16  courts if it is "capable of raising a reasonable doubt of a

17  defendant's guilt," *People v. Hall*, 41 Cal.3d 826, 833 (1986), and

18  is admissible under the California Evidence Code ("CEC"), *People v.*

19  *Prince*, 40 Cal.4th 1179, 1239 (2007). Evidence of Mendoza's prior and

20  subsequent violent acts would be inadmissible to show his propensity

21  to shoot Aguilera. CEC § 1101(a).[13] Further, Petitioner has not put

22  forward a valid argument that Mendoza's bad acts would be admissible

23  to prove motive, opportunity, intent, preparation, plan, knowledge,

24  identity, absence of mistake or accident, or some other fact other

25

26  _____

27  [13] Section 1101(a) provides that evidence of a person's character
   or a trait of character in the form of evidence of specific instances
   of his or her conduct is inadmissible when offered to prove his or her

28  conduct on a specified occasion.

than his disposition to commit such an act. CEC § 1101(b).[14]
Propensity evidence is not made admissible merely by its relabeling
as motive or intent evidence. *See People v. Farmar*, 47 Cal.3d 888,
921 (1989)(holding that prior acts evidence of third party
culpability purportedly showing motive and intent, but essentially
showing that third party was more likely to have been the killer
because of his history of violence, is inadmissible.); *People v.
Davis*, 10 Cal.4th 463, 501 (1995)(holding that exclusion of evidence
that third party previously engaged in forcible group sex was proper
because those events and the crime of rape and murder were not
sufficiently similar to establish third party's motive, intent or
identity for CEC § 1101 purposes). None of the documents detailing
Mendoza's propensity for violent crime could have been admitted to
show that he was more likely to have shot Aguilera because of that
propensity.[15] Accordingly, Stein's failure to seek out and obtain
these documents and the government's failure to produce them would
not demonstrate prejudice, to the extent Petitioner suggests that he

---

[14] In his merits briefing, Petitioner argues that "*any* reasonable practitioner contemplating a third party culpability defense would seek out the existing criminal case records regarding the third party in question to determine whether there were prior similar violent acts that would be admissible under Evidence Code section 1101 for 'motive, identity, common plan,' etc., and would have filed a discovery motion to obtain police reports and arrest reports of *other* violent conduct that did not end up in a formal prosecution. Where the third party culpability defense is based on the premise that the client is a law-abiding family man, while the third party is a violent gangbanger, counsel has an obligation to investigate the third party's criminal history for corroborating evidence." (Reply to Resp't's Ans. to Pet. at 13.) However, Petitioner does not explain how the fact that Mendoza was involved in violent gang crime previous or subsequent to the shooting of Aguilera would show motive, identity, common plan, or any other category admissible under section 1101(b).

[15] Such evidence also would not have been admissible as impeachment evidence because neither Mendoza nor any other person connected to his violent crimes testified at Petitioner's trial.

1  was prejudiced by the absence of information from these reports at
2  his trial.

3      Petitioner reasons that even if the documents would have been
4  inadmissible, he is still entitled to discover them for the purpose
5  of their "informational value." (Reply to Opp. to Mot. for Disc. at
6  3.) Petitioner elaborates on this elsewhere: "The police reports
7  sought in the accompanying discover [sic] motion may or may not be
8  independently admissible, other than as impeachment, etc., but are
9  highly likely to provide information leading to direct evidence of
10 Mendoza's guilt, e.g., percipient witnesses, individuals who heard
11 other admissions by Mendoza, etc." (Reply to Opp. to Mot. for Evid.
12 Hr'g at 2-3.) The Court disagrees. It seems highly unlikely that a
13 fuller picture of Mendoza's involvement in previous or subsequent
14 violent crimes – each of which was apparently unrelated to Aguilera's
15 shooting – would have led to witnesses or admissions that might prove
16 Mendoza's connection to Aguilera's shooting. Even the "information
17 value" of Mendoza's violent activities, if any, would not resolve
18 whether or not Stein's representation was constitutionally defective
19 or the government violated its obligations under *Brady*. "Good cause"
20 is lacking for subpoenas concerning Mendoza's record of violent
21 crimes.

22     **B.   Petitioner is Not Entitled to Depose Detective Michael**
23          **Delmuro**

24     Petitioner requests leave to depose Detective Delmuro, who
25 investigated the Aguilera shooting, in support of his *Brady* claim
26 that the government unconstitutionally failed to disclose Mendoza's
27 record of violent crime. (Req. for Disc. at 5-6; Reply to Resp't's
28 Ans. to Pet. at 27-28.) The scope of the deposition would "regard[]

18

1   his failure to apprise deputy district attorney Marcia Ramirez of his
2   extensive knowledge of Manuel Mendoza's violent criminal background,
3   and his motive for perpetrating the Aguilera shooting." (Req. for
4   Disc. at 6.) Factual development of these matters will not aid in the
5   resolution of the *Brady* claim.

6        A *Brady* violation has three components: "The evidence at issue
7   must be favorable to the accused, either because it is exculpatory,
8   or because it is impeaching; that evidence must have been suppressed
9   by the State, either willfully or inadvertently; and prejudice must
10  have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).
11  Evidence "'known only to police investigators and not to the
12  prosecutor'" is also encompassed by this rule. *Id.* (quoting *Kyles v.*
13  *Whitley*, 514 U.S. 419, 438 (1995)); *see also Gantt v. Roe*, 389 F.3d
14  908, 919 n.3 (9th Cir. 2004). However, the intent of the government
15  actor(s) charged with suppressing favorable, material evidence is
16  irrelevant to the *Brady* inquiry. The constitutionally suspect
17  suppression may be either willful or inadvertent. *Strickler*, 527 U.S.
18  at 282; *see also Gantt*, 389 F.3d at 912 ("*Brady* has no good faith or
19  inadvertence defense."). The success or failure of Petitioner's *Brady*
20  claim will turn on the nature of the evidence that he claims was
21  suppressed, not on whether Dective Delmuro acted willfully or
22  inadvertently. Detective Delmuro's testimony would not help resolve
23  this claim. "Good cause" for his deposition is lacking.

24        C.   **Petitioner is Not Entitled to a Subpoena Duces Tecum for**
25             **an Audio Copy or Transcript of the Conversation between**
26             **Olivares and his Girlfriend**

27        Petitioner seeks a transcript of the Los Angeles Sheriff's
28  Department's tape recording of the jailhouse conversation between

1  Francisco Olivares and his Olivares' girlfriend on August 17, 2001,
2  in which Olivares discussed Petitioner's ignorance of who actually
3  shot Aguilera and his own efforts to dissuade Petitioner from
4  investigating the identity of Aguilera's shooter. (Req. for Disc. at
5  6.) Petitioner's counsel already has a copy of the tape. (*Id.*) As
6  discussed above, he attached a transcript of the conversation to his
7  petition for writ of habeas corpus to the Supreme Court of
8  California. Petitioner claims that the quality of the tape is not
9  good and there are inaudible portions. (*Id.*) Considering that the
10 state courts did not allow Petitioner to engage in post-sentencing
11 discovery, the tape currently in the possession of Petitioner's
12 counsel is necessarily the same tape that the prosecution turned over
13 to Stein prior to trial on November 5, 2001. (CT 76.) Whether Stein's
14 representation was constitutionally ineffective can be decided on the
15 basis of the tape and transcripts that he had in his possession at
16 the time of trial. Further, the conversation on which this claim
17 hinged is already transcribed with near completeness. There is not
18 "good cause" to require the state to produce a fresh audio copy of
19 the conversation or a full transcript.

20    **D.    Petitioner is Entitled to a Subpoena Duces Tecum for**
21         **Investigatory Reports of the Killings that Preceded the**
22         **Shooting of Aguilera**

23    Petitioner requests a subpoena duces tecum for all police
24 reports relating to the May 27, 2000 murder of Romero and the June
25 29, 2000 murder of Torres. (Req. for Disc. at 3-4.) Petitioner argues
26 that these reports would have buttressed the defense of Mendoza's
27 culpability by showing that he had a retaliatory motive to shoot
28 Aguilera on July 5, 2000. Petitioner contends that counsel was

1  constitutionally ineffective for failing to request these records.

2  He also contends that the government violated *Brady* by not producing

3  them to the defense. As discussed in section I.C., above, Petitioner

4  testified to Mendoza's involvement in the killings of Romero and

5  Torres at a hearing on his motion for a new trial. There is no other

6  evidence in the record linking Mendoza to these killings.

7           1.    **Discovery of the Police Reports as to the IAC Claim**

8                 **is Unwarranted**

9        An IAC claim requires a showing that counsel's performance was

10  deficient, i.e., that it fell below an objective standard of

11  reasonableness, and prejudicial. *Strickland v. Washington*, 466 U.S.

12  668, 687 (1984). "A decision not to investigate must be assessed for

13  reasonableness, applying a heavy measure of deference to counsel's

14  judgments." *Richter v. Hickman*, 521 F.3d 1222, 1229 (9th Cir. 2008).

15  Petitioner contends that Stein's failure to investigate the killings

16  of Romero and Torres was one of several omissions that prove he

17  rendered  ineffective assistance. (Reply to Ans. to Pet. at 15-16.)

18        Even assuming that the information in the investigatory reports

19  was highly exculpatory, Petitioner could not show that it was

20  unreasonable of Stein to not request the reports. Petitioner

21  testified that he did not inform Stein why he believed Mendoza shot

22  Aguilera prior to trial. (RT 968.) The necessary conclusion is that

23  prior to trial Petitioner did not tell Stein about Mendoza's alleged

24  connection to the two shootings. The Court is aware of no case law

25  holding trial counsel to the standard of a mind reader. Further,

26  Petitioner has not indicated that prior to trial Stein otherwise knew

27  of Mendoza's alleged connection to the two shootings, or even of the

28  very fact of those shootings. Stein could hardly be expected to

spontaneously investigate every homicide and aggravated assault recently committed in East Los Angeles in the hopes of discovering some act admissible to show that Mendoza had a motive to shoot Aguilera.[16] Given that these records could not demonstrate that Stein's performance was deficient, "good cause" for a subpoena duces tecum is absent as to the IAC claim.

### 2. Discovery of the Police Reports as to the *Brady* Claim is Warranted

A successful *Brady* claim requires a showing that the suppressed evidence was both favorable to the accused and material, in the sense that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[17] *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Discovery of the police reports would help resolve whether these showings can be made. The Court does not speculate as to the actual contents of these reports. However, assuming for the sake of this motion that the reports indicate that Torres was killed in retaliation for Mendoza's killing of Romero, the reports would have been admissible under CEC § 1101(b) as evidence

---

[16] The Los Angeles County Sheriff's Department recorded 59 homicides and 4,470 aggravated assaults in East Los Angeles in 2000. *See* http://www.lasd.org/sites/yir9600/yir2000/232.html.

[17] Brady analysis is by its nature retrospective. *U.S. v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)("[U]nder *Brady* ... the scope of the government's constitutional duty – and concomitantly, the scope of a defendant's constitutional right – is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial."); *U.S. v. Hayes*, 376 F.Supp.2d 736, 739 (E.D. Mich. 2005)("The typical *Brady* issue si retrospective, that is, the court examines the materiality of the non-disclosed evidence in the context of a completed criminal trial which has resulted in a verdict of guilty, to assess the probable effect of the evidence on the verdict.").

22

of Mendoza's motive to shoot Aguilera. Depending on the quality of the evidence of Mendoza's involvement, Petitioner could show that the failure to disclose was material in that there is a reasonable probability of a different verdict. *Strickler*, 527 U.S. at 281. There is "good cause" for discovery of the police reports on the Romero and Torres killings.

### III. Petitioner is Entitled to an Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *See Schriro v. Landigran*, 127 S.Ct. 1933, 1940 (2007). Petitioner seeks an evidentiary hearing to develop three aspects of his claims:

1.  Counsel's failure to conduct adequate pre-trial investigation in support of any defense of innocence.

2.  The prosecution's breach of the duty to disclose exculpatory evidence.

3.  The nature and quality of the evidence demonstrating Madrigal's innocence (i.e. Mendoza's culpability), so as to evaluate prejudice under *Strickland* and *Brady*.

(Mot. for Evid. Hr'g at 2, 4.)

An evidentiary hearing could enable Petitioner to prove the factual allegations necessary to show IAC. Based on the record before the Court, Petitioner is entitled to conduct an evidentiary hearing on his IAC claim, limited in scope to Stein's failure to: request ballistics testing prior to trial; put Madrigal on the stand after promising to do so; adequately interview and call to testify Victor

23

1  Madrigal, Petitioner's brother, and Robert Howard, Petitioner's
2  supervisor; investigate and present at trial the taped conversation
3  between Olivares and Olivares' girlfriend suggesting Madrigal's
4  innocence; and investigate and present a third-party defense. Further
5  development of these matters would help resolve the claim that Stein
6  provided constitutionally ineffective assistance. Factual development
7  on other aspects of the IAC claim are unwarranted. *See Totten v.*
8  *Merkle,* 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing
9  is *not* required on issues that can be resolved by reference to the
10 state court record.").

11     Development of the *Brady* claim at the evidentiary hearing is
12 unwarranted. Petitioner seems to want to do the same thing in the
13 evidentiary hearing that he sought to do through discovery: show that
14 Detective Delmuro intentionally withheld information about Mendoza
15 from the defense. (Mot. for Evid. Hr'g at 4.) As discussed in section
16 II.B., above, Detective Delmuro's knowledge and intentions are
17 irrelevant to the *Brady* inquiry. Further factual development is
18 unnecessary.

19     Finally, Petitioner is not entitled to explore the "quality of
20 the evidence of innocence" in the requested manner. It is true that
21 evidence of Petitioner's innocence is relevant to resolving the
22 prejudice prongs of both the ineffective assistance and *Brady* claims.
23 However, by the terms of his motion, Petitioner does not seek to
24 develop the prejudice inquiry as to any particular act or omission
25 of Stein related to the third-party culpability defense. Rather,
26 Petitioner essentially seeks to reopen the state criminal proceedings
27 by presenting expert testimony on the unreliability of eyewitnesses.
28 This is not the role of a habeas court. *Bell v. Cone,* 535 U.S. 685,

24

693 (2002)("The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal  habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."). Petitioner is not entitled to present expert testimony on the unreliability of eyewitnesses.

**IV.  Conclusion**

For the reasons provided, Petitioner's request for authorization to conduct discovery is **GRANTED** in part and **DENIED** in part. His motion for an evidentiary hearing is **GRANTED** in part and **DENIED** in part.

Dated: July 3, 2008

Marc L. Goldman
United States Magistrate Judge

25